UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HUMANE SOCIETY OF THE UNITED STATES
1255 23RD STREET NW, SUITE 450
WASHINGTON, D.C. 20037

CIVIL ACTION NO. 20-829

PLAINTIFF

V.

AGRICULTURAL MARKETING SERVICE
UNITED STATES DEPARTMENT OF AGRICULTURE
1400 INDEPENDENCE AVE. SW
WASHINGTON, D.C. 20250

DEFENDANT

## AMENDED COMPLAINT FOR INJUNCTIVE RELIEF

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq*., as amended, seeking disclosure of records requested from the Agricultural Marketing Service ("AMS" or "Defendant"), an agency of the U.S. Department of Agriculture ("USDA"). Specifically, the Humane Society of the United States ("HSUS") requested records related to activity and expenditures of the government's pork "checkoff" program, which is one of a group of federal commodity promotion programs operated under the control of AMS, with assistance from an administrative component of the agency, the National Pork Board. The combined budget of AMS' checkoff programs is nearly

1

a billion dollars every year, which must be spent in accordance with strict legal mandates and restrictions. Checkoff abuses pose threats to a wide array of public interests, including animal protection, consumer safety, and independent farmers. As such, transparency of federal program activity—as FOIA is designed to ensure—is critical among government checkoffs.

## JURISDICTION

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B).

## VENUE

3. Venue is proper in this judicial district under 28 U.S.C. § 1391(e). Defendant resides in this district, and a substantial part of the events or omissions giving rise to this action occurred or will occur in this district.

## THE PARTIES

4. Plaintiff HSUS is a national nonprofit animal protection organization headquartered in the District of Columbia and incorporated under the laws of Delaware. HSUS actively advocates against practices that injure, harass, or abuse animals, and provides its members and the public with information regarding animal welfare on a variety of topics, including government policy and activities that impact farm animals.

5. HSUS also closely monitors AMS checkoff programs and expenditures, many of which directly bear on issues relating to farm animal welfare. HSUS collects,

reviews, and analyzes the information received through FOIA and uses it to inform its members and the public about the activities and operations of government checkoff programs, as well as in its work to prevent program abuses.

6. Defendant AMS is an agency of USDA, an Executive Department of the United States government. AMS administers USDA's commodity promotion programs (commonly called "checkoffs"), over which the agency governs, and is liable for, all activity. AMS establishes component administrative boards for each checkoff (e.g., the National Pork Board), but supervises and controls all conduct and expenditures of such agency boards.

## **LEGAL FRAMEWORK**

7. FOIA requires agencies of the federal government to release information to the public upon request, unless the agency demonstrates that one of nine specific exemptions applies. 5 U.S.C. § 552(a)(3)(A), (b). FOIA "encourages accountability through transparency" and "is the most prominent expression of a profound national commitment to ensuring an open Government." Presidential Memorandum for Heads of Executive Departments and Agencies Concerning the Freedom of Information Act, 74 Fed. Reg. 4683, 4683 (Jan. 21, 2009). FOIA "should be administered with a clear presumption: In the face of doubt, openness prevails . . . The presumption of disclosure should be applied to all decisions involving FOIA." *Id.*

8. Upon receiving a FOIA request, an agency has twenty (20) working days to make a final compliance determination in response to the request. 5 U.S.C. § 552(a)(6)(A)(i). If "unusual circumstances" apply, FOIA authorizes a final

3

determination extension of up to 10 working days. 5 U.S.C. § 552(a)(6)(B). A requestor is deemed to have exhausted its administrative remedies, and may seek immediate judicial review of the matter, if the agency fails to comply with these time limits. *Id.* at § 552(a)(6)(C)(i).

9. In FOIA cases, whether records must be produced or are subject to an exemption is determined by the court de novo. 5 U.S.C. § 552(a)(4)(B). FOIA places "the burden ... on the agency to sustain its action." *Id.*

10. USDA's pork checkoff program is governed by the Pork Promotion, Research, and Consumer Information Act of 1985, 7 U.S.C. §§ 4801-19. The Act authorizes a non-political, promotional program of government speech, operated under the Secretary's strict control over program activities, including program messaging and spending. Like all federal checkoffs, the pork checkoff is funded by producers, who voted by referendum to accept the financial burdens of the program in exchange for the policy-neutral, market-expanding services they are promised by the Act. All combined, the budgets for USDA's checkoff programs amount to nearly a billion dollars every year. FOIA records relating to the agency's checkoff programs have revealed repeated incidents of serious misuse of funds and improper conduct, and have prompted federal legislation calling for statutory reforms to prevent abuses of these federal programs.

## FACTS GIVING RISE TO CLAIMS FOR RELIEF

### A.  The Subject of the FOIA Request

11. Federal checkoffs are required to be operated as nonideological programs of government speech, funded by mandatory assessments against farmers, and intended to promote certain agricultural commodities. *See, e.g.,* 7 U.S.C. § 4801; 7 U.S.C. § 7401. As federal programs, checkoffs are subject to various operational and spending requirements and restrictions, including specific prohibitions against anticompetitive activity and attempts to influence government policy, as well as general federal fiscal rules against waste and mismanagement of funds.

12. Despite their policy-neutral requirements, federal checkoff boards are often comprised of members with close ties to industry trade associations that lobby for specific policies on various industry issues (including animal welfare). *See*, *e.g.*, *Californians for Humane Farms v. Schafer*, 2008 WL 4449583 (N.D. Cal., Sept. 29, 2008). In the case of USDA's pork checkoff, litigation resulted in a 2001 settlement that promised that the federal pork board would only be permitted to do business at arm's length with the industry trade group, National Pork Producers Council ("NPPC"). *See Michigan Pork Producers Ass'n, Inc. v. Campaign for Fam. Farms*, 174 F. Supp. 2d 637, 639 (W.D. Mich. 2001). Thus, there was a forced separation of operations and revenue streams between USDA's pork board and NPPC.

13. Yet soon after the settlement agreement, the pork checkoff program began to use the trademarked slogan "Pork: The Other White Meat" ("PTOWM") as a revenue stream for NPPC through artificially inflated annual license fees, despite

5

the fact that the slogan had already been adopted, developed exclusively with public funds, and promoted by the checkoff as its own for the previous 20 years. In 2006, the pork checkoff program executed a long-term revenue stream for NPPC, using producer funds, that wasn't anything close to arm's length. The deal called for a quadrupling of the annual license fees in order to suddenly "purchase" the trademark for an exorbitant $60 million payout to the industry's lobbying association. Even after the trademark was retired and replaced in 2011, the purchase payments continued at the rate of $3 million annually despite having the express option to terminate the contract.

14. Following a 2018 court ruling finding the payments unlawful and enjoining them, the purchase agreement for PTOWM was terminated.[1] Despite ending the contract, however, the government revealed in a 2019 court filing that the federal pork board was, in fact, continuing to pay NPPC licensing fees for the trademarks and that it has requested "authorization for a new purchase agreement" for them.

B. **The HSUS Request for Records**

15. On August 8, 2019, HSUS submitted a FOIA request to AMS, which the agency designated as 2019-AMS-00227-F.

16. The FOIA request sought "all records relating to the licenses obtained for the trademarks in 2018 and 2019, and all records relating to the request to authorize a new purchase agreement." The request expressly included the following:

---

[1] The government appealed a portion of the ruling impacting its termination of the purchase contract, but ultimately the decision was vacated on jurisdictional grounds.

A. All documents relating to the licenses and new purchase proposal for the trademarks (including proposal memos, USDA determination records, contracts or other agreements, any other records regarding the terms of the licenses, valuations and other supporting materials, records with information accounting for checkoff-funded contribution to the value of the marks, etc.).

B. All communications (including emails, attachments, text or messaging apps, memos, or written correspondence) regarding the licenses and new purchase proposal for the trademarks. This should be construed to cover all internal and external communications.

17. HSUS requested the records be disclosed in a format that fully reproduces all information from the original records, including metadata and attachments.

18. HSUS requested a fee waiver under FOIA's public interest and news media provisions, accompanied by detailed explanation of the grounds for the request. *See* 5 U.S.C. § 552(a)(4)(A).

C. **The Response to the HSUS Request for Records**

19. After initially exercising FOIA's "unusual circumstances" extension of up to 10 business days, AMS issued a "first interim response" on September 13, 2019. The non-final response included only the pork checkoff's general budget (which in previous years was routinely posted on the checkoff website without requiring a FOIA request). There were *no* records specific to the items in the HSUS request.

20. AMS' response did not include a final compliance determination as to disclosures or claims of exemption. *See* 5 U.S.C. § 552(a)(6)(A)(i)(I). Nor did AMS

7

provide any indication of how many records remained to be processed or an expected date of completion for their determination and production.[2]

21. Six months later, on March 5, 2020, AMS issued a "second interim response" relating to 343 pages, which contained extensive redactions claimed under FOIA's Exemptions 4, 5, and 6. While the response provides a general description of the categorical reasons for the redactions, it lacks any specificity that would be necessary to make a meaningful assessment whether or not they are legally justified.

22. Like the previous one (cited in ¶ 20), AMS' "second interim response" did not include a final compliance determination. Nor again did AMS provide any indication of how many records remained to be processed or an expected date of completion for their determination and production.[3]

23. At the time this case was filed, HSUS had received no further communication or records from AMS, despite FOIA's 30-day deadline to make a final compliance determination having long passed. HSUS was thus deemed to have exhausted its administrative remedies and permitted to seek judicial review of the matter, which it did by filing the initial complaint in this case on March 27, 2020. *See* 5 U.S.C. § 552(a)(6)(C)(i).

---

[2] Further indication that AMS' neither actually nor intended its response to be final is evidenced by the agency's omission of the statutorily required option for administrative appeal in the notice, instead indicating it would "include your appeal rights in our final release." *See* 5 U.S.C. § 552(a)(6)(A)(i)(III).

[3] AMS again omitted the statutory administrative appeal option because "this is not a final response to [HSUS'] FOIA request."

**D.** <u>**Agency Response After Initiation of District Court Case**</u>

24. After the complaint in this case was filed, Defendant indicated it would produce a final response by mid-June 2020. As the time required to execute service would not run until the end of June, Plaintiff told Defendant it would hold off doing so until receiving and reviewing the final mid-June response in order to determine the scope of any further proceedings in this case.

25. On May 6, 2020, AMS issued a "third interim response" relating to 894 pages, which again contained extensive redactions claimed under FOIA's Exemptions 4, 5, and 6. While the response provides a general description of the categorical reasons for the redactions, it lacks specificity that would be necessary to make a meaningful assessment whether or not they are legally justified.

26. On June 12, 2020, AMS issued a final response, which related to 538 pages and which again contained extensive redactions claimed under FOIA's Exemptions 4, 5, and 6. While the response provides a general description of the categorical reasons for the redactions, it lacks specificity that would be necessary to make a meaningful assessment whether or not they are legally justified.

27. In addition to the expansive redactions, AMS has apparently omitted altogether records central to the HSUS FOIA request, including the purchase authorization proposal (cited in ¶ 14). Nor has the agency identified any analysis and decision memo related to the purchase request, correspondence regarding the proposal, contracts or payment details related to the new purchase, etc. Such written documentation is mandated by USDA and checkoff procedures.

28. Given the significant amount of redactions and apparent omissions of extant records that should have been identified and included in the agency response, Plaintiff believes that further proceedings in accordance with this amended complaint are necessary to resolve this matter.

## CLAIM FOR RELIEF

### Violation Relating to the Failure to Identify and to Promptly and Fully Produce Responsive Records

29. Plaintiff hereby incorporates by reference all the preceding paragraphs as if fully set forth herein.

30. Plaintiff is deemed to have exhausted its administrative remedies when this case was filed and the Court's jurisdiction established, as AMS was well beyond the time limit for making a final compliance determination and promptly producing records in response to Plaintiff's FOIA request.

31. As of the date of this filing, the agency has failed to promptly and fully produce all records responsive to Plaintiff's FOIA request. AMS hasn't even produced the records relating to the new purchase request that were referenced in the agency's May 2019 court filing (cited in ¶ 14), which presumably are already known and readily available to the agency's FOIA officers. (The first nonfinal response contained only the pork checkoff general budget and the second nonfinal response, processed six months later, contained extensively redacted records relating to licenses, but none relating

to the new purchase. Even the post-complaint responses apparently omitted these records so central to the request.)

32. To date, the agency has failed to adequately search for and identify numerous critical records. Some of these records would have been produced as part of AMS' standard procedures for reviewing and making a decision on a transaction of this type.

33. Defendant has wrongfully withheld extensive amounts of information from Plaintiff by making broad claims of exemption with little or no substantiation. Defendant further is wrongfully withholding non-exempt agency records requested by Plaintiff by failing to identify and produce non-exempt records responsive to its FOIA request, and by failing to segregate exempt information in otherwise non-exempt records responsive to its FOIA request.

34. Plaintiff is entitled to injunctive relief compelling AMS to promptly produce all non-exempt records (and information therein) responsive to its FOIA request.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court issue an Order:

A. Requiring Defendant to promptly identify and produce all non-exempt records responsive to Plaintiff's FOIA request;

B. Granting Plaintiff's fee waiver request;

C. Awarding Plaintiff costs and reasonable attorneys' fees; and

D. Awarding Plaintiff any other relief that is just and proper.

Respectfully submitted on July 24, 2020.

/s/ Matthew E. Penzer
Matthew E. Penzer, Bar ID CO0016
Ralph E. Henry, DC Bar No. 982586
THE HUMANE SOCIETY OF THE UNITED STATES
1255 23rd Street NW, Suite 450
Washington, DC  20037
(240) 271-6144
(202) 676-2357 Facsimile

Counsel for Plaintiff

12